*Reversed and remanded.*

Opinion delivered October 19, 1887.

## No. 2611.

## Ed Turner v. The State.

1. BURGLARY—ENTRY.—The entry of a room or house, if made with the free consent of the proprietor or occupant, is not a burglarious entry.
2. BURGLARY WITH INTENT TO RAPE—FACT CASE.—See the opinion and the statement of the case for evidence *held* insufficient to support a conviction for burglary with intent to commit rape.

APPEAL from the District Court of Smith. Tried below before the Hon. F. J. McCord.

The conviction in this case was for the burglary of the house of Adam and Mattie Watson, with intent to commit rape upon the person of the said Mattie Watson. The penalty assessed against the appellant was a term of eight years in the penitentiary.

Mattie Watson was the first witness for the State. She testified, in substance, that she was the wife of Adam Watson, and lived with him in his house, in Smith county, Texas, in July, 1887. There were three doors to the room occupied by the witness and her husband, two of which opened to the outside world. The third door was in the partition which separated that room from the room occupied by Henry Lacey, the defendant's brother-in-law. One of the outside doors fastened on the inside and could not be opened from without. The other fastened with a

Statement of the case.

latch which could be sprung from the outside and the door be opened. The door leading into Lacey's room was secured by a string attached to a nail in Lacey's room, and could be opened from that room.

At about dusk on the evening of July 27, 1887, the witness's husband left home to go to the field and pull fodder, it being his practice, on account of the hot weather, to work at night and sleep during the day. Upon the departure of her husband the witness, without undressing, and leaving the door open and the lamp burning, lay down across the bed in her room and was soon asleep. Within a short time witness was awakened by Will Richardson, who en route to the field to pull fodder, called to witness asking for her husband. Witness told Richardson that her husband had already gone to the fodder field. Richardson then advised witness to extinguish the lamp as a precaution against fire, and left, going toward the field. Thereupon the witness got up, blew out the lamp, closed the doors, returned to bed without undressing, and was soon asleep. About eleven o'clock she was awakened by some one pressing on her stomach. Getting up, she went to the door, and then to the fire place, where she stirred the fire. She saw no one in her room nor could she hear any one moving about in the house. She then called her husband by name. Receiving no reply, she called Henry Lacey. Lacey failing to reply, she called to the defendant and asked him what he had been doing in her room. He replied that he had not been in the witness's room. Witness told him that he was a liar. He replied that the witness was a d—d liar, and the witness retorted that he was another. During the progress of this quarrel the witness summoned her husband from the field by blowing a horn. He arrived about twenty minutes later, accompanied or followed shortly by Henry Lacey and Will Richardson. After the arrival of her husband the defendant asked witness to drop the matter, adding that if she would do so he would continue to treat her with the respect he had previously observed toward her. Witness's room was entered on this occasion without her knowledge, permission or consent. Defendant frequently stayed with his brother-in-law, Lacey, but at the time of this offense he had been absent about two days. Witness and her husband had always lived together peaceably.

Adam Watson, the husband of the first witness, testified, for the State, that he went to work in his fodder field about dusk on the evening of July 27, 1887. He was soon joined in the field by Will

Richardson. Between twelve and one o'clock the witness heard the blowing of the horn at his house and went rapidly home. Upon his arrival he found the defendant sitting on the side of the bed in Henry Lacey's room, his shoes off and lying on the floor. The witness's wife was standing in the door between the two rooms, quarreling with the defendant. Witness asked what was the matter. His wife replied that the defendant entered her room unbidden and got on top of her. Defendant remarked that the witness's wife was a d—d liar. A quarrel between the parties present ensued, and witness told defendant to leave the place and never return to it. About that time the parties, being then in the yard, were joined by Henry Lacey and Will Richardson. Witness left the parties named and went to McFarland's to get an officer to arrest the defendant. He failed to procure an officer, and on his return found that defendant had left the house. Defendant was arrested in the field on the following morning. The witness had never had occasion to question his wife's fidelity to him.

Henry Lacey, the defendant's brother-in-law, testified, for the State, that he lived in a house on McFarland's farm, and occupied a room adjoining that of Adam Watson and his wife Mattie. Defendant worked for McFarland, and, in July, 1887, roomed with the witness. Witness reached his room on the evening of July 27, 1887, a little after dark, and after Adam Watson and Richardson had gone to the fodder field. Passing to the shed room to get supper, the witness observed that both of the outside doors of Watson's room were open. There was a light in the room, and Mattie Watson was lying across the bed. He did not observe the door leading from the Watsons' into his room. After supper witness went to his work in the fodder field. At about twelve o'clock he heard the blowing of the horn and went back to the house. On his arrival he found defendant, Mattie, Adam and Richardson in the yard, quarreling. Witness asked defendant what was the matter. He replied: "Mattie is mad with me, and is trying to get me into trouble; she is telling a lie on me." The witness then tried to make peace between the parties, and asked defendant if the charge against him was true. He replied: "If Mattie says it's so I guess it must be so." Adam soon left the place in quest of an officer. Defendant then proposed to stay all night with witness, as had been his custom, but witness would not permit him, and he left. The witness had often observed Mattie and defendant talking and laughing with

each other.  There was, however, a slight coolness between
them because of defendant's report to Liza Wooten of a state-
ment made to him by Mattie concerning the relations of the
witness and the said Liza, who were then sweethearts.

Will Richardson testified, for the State, that he went by Wat-
son's house early on the night of the alleged offense, and called
for Adam Watson to go to the fodder field.  He found the out-
side doors of Watson's room open, a lamp burning on the mantel-
piece and Mattie Watson lying across the bed.  When he asked
for Adam, Mattie raised her head and said that he had gone to
the field.  Witness then advised Mattie to extinguish the lamp,
and left, going to the field, where he joined Adam.  Mattie did
not get up from the bed while witness was at the house.  About
twelve o'clock the horn sounded, and Adam left the field for the
house.  Witness followed, and when he reached the house he
found Mattie, defendant and Adam in the yard, quarreling.  He
asked the cause of the row, when defendant said that Mattie
was mad with him and was trying to get him into trouble.
Witness made an effort to restore peace, and, failing, went
home.  He could not say whether or not the lamp was still burn-
ing and the doors of Watson's room open when he got back to
the house from the field.

The State closed.

Liza Wooten testified, for the defense, that, at the time of the
alleged offense, Mattie Watson was angry with defendant, be-
cause he reported to witness a statement made about her and
Henry Lacey by the said Mattie.  A day or two before the alleged
offense Mattie told witness that she intended to get even with
defendant, and that upon their next meeting she intended to
whip him or be whipped by him.

The motion for new trial raised the questions discussed in the
opinion.

*C. D. Morris* and *R. L. Robertson*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WILLSON, JUDGE.  As presented to us in the record, the ev-
idence does not support the conviction.  Defendant had been in
the habit, prior to the alleged burglary, of sleeping in one room
of the house with his brother-in-law, who occupied said room,

who had authority to, and did permit him to enter said room and sleep therein on several occasions prior to the alleged burglary. In fact, at the time of the alleged burglary, the defendant was living with his said brother-in-law at said house, they occupying one room of said house, while Adam Watson and wife occupied another room in said house. An entry into the room occupied by defendant's brother-in-law, if made with the free consent of said brother-in-law, would not be a burglarious entry, and the evidence tends strongly to show that the defendant had such consent of his brother-in-law to enter said room. (Penal Code, article 706.) As to said room, then, the evidence certainly does not establish a burglary.

As to the room occupied by Watson and his wife, there is no positive testimony that the defendant entered it. He was not seen in that room, and all the evidence tending to prove his presence in said room is found in the testimony of Watson's wife, who testified that she was on her bed asleep, and was awakened by some one pressing on her stomach. She saw no one in the room, nor did she hear any one moving about in the room. She went to the fire place and stirred up the fire, and, finding that the defendant was in the adjoining room, she accused him of having come into her room, which accusation he stoutly denied.

But, conceding that the evidence sufficiently proves that the defendant entered Watson's room, does it sufficiently prove that his intent in doing so was to commit the crime of rape upon Watson's wife, as alleged in the indictment? Admit that he was in the room, and that he pressed upon the stomach of the woman while she was asleep, we do not think, considering the other facts in this case, that his acts show an intent to ravish the woman. He did not get in the bed with her; did not attempt to pull up her clothes; did not use or attempt to use any force upon her except to press upon her stomach, and how heavily, how long, and in what manner he pressed upon her stomach we are not informed by the evidence. He did not attempt to use any stratagem to induce the woman to believe that he was her husband. He did nothing whatever but "press upon her stomach," and the evidence that he did that is circumstantial, and not above the suspicion of being fabricated, or at least, the product of a distorted imagination. We can not give our approval to a conviction founded upon such testimony as this record presents. It is altogether too uncertain, indefinite and equivocal to justify

a court in depriving a citizen of his liberty, and fixing upon him the stigma of a felon.

The judgment is reversed, and the cause is remanded.

*Reversed and remanded.*